**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.

No. 98-4637

JOSEPH ABED, a/k/a Joseph Abbott,
a/k/a Pancake Joe, a/k/a Joe, a/k/a
Godfather,
<u>Defendant-Appellant.</u>

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.                                                    No. 98-4642

THAIER OMAR ABED, a/k/a Little O,
<u>Defendant-Appellant.</u>

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.                                                    No. 98-4647

AMAR KHALID ABED, a/k/a Omar,
<u>Defendant-Appellant.</u>

UNITED STATES OF AMERICA,
<u>Plaintiff-Appellee,</u>

v.                                                    No. 98-4648

OBADYA HANIFI ABED, a/k/a Beta,
<u>Defendant-Appellant.</u>

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                    No. 98-4649

FAHAD T. TAWALBEH,
Defendant-Appellant.

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                    No. 98-4670

RAYED FAWZI ABED,
Defendant-Appellant.

Appeals from the United States District Court
for the Western District of Virginia, at Roanoke.
Samuel G. Wilson, Chief District Judge.
(CR-97-24-R)

Argued: October 28, 1999

Decided: January 10, 2000

Before NIEMEYER and WILLIAMS, Circuit Judges,
and HAMILTON, Senior Circuit Judge.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Harwell M. Darby, Jr., GLENN, FELDMANN, DARBY
& GOODLATTE, Roanoke, Virginia; Rhonda Lee Overstreet, Roa-

noke, Virginia; Melissa Windham Friedman, Roanoke, Virginia; James Peyton Cargill, LAW OFFICES OF DANIEL L. CRANDALL, P.C., Roanoke, Virginia, for Appellants. Thomas Ernest Booth, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee. **ON BRIEF:** Gary L. Lumsden, Roanoke, Virginia, for Appellant Joseph Abed; Rena Gladys Berry, Roanoke, Virginia, for Appellant Amar Abed. Robert P. Crouch, Jr., United States Attorney, Thomas J. Bondurant, Assistant United States Attorney, Julie C. Dudley, Assistant United States Attorney, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

---

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

PER CURIAM:

Joseph Abed, Amar Abed, Obadya Abed, Rayed Abed, Thaier Abed, and Fahad Tawalbeh (collectively, Appellants) were convicted by a jury of committing various federal crimes arising out of a criminal enterprise of which Appellants were alleged to be members.[1] Appellants jointly and individually assert a number of different grounds for reversal on appeal, principally that the district court erred in instructing the jury on the proof necessary to find Appellants guilty of conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C.A. § 1962(d) (West Supp. 1999); that the evidence presented by the Government was insufficient for the jury to find Joseph, Amar, Obadya, and Rayed guilty of a substantive RICO offense, 18 U.S.C.A. § 1962(c) (West 1984); that the evidence was insufficient to find Joseph, Amar, Obadya, and Rayed guilty of RICO conspiracy, 18 U.S.C.A. § 1962(d); that the evidence was insufficient for the jury to find Joseph guilty of two predicate acts of

---

[1] For the sake of brevity and convenience, all subsequent references to individual Appellants who are Abeds will use their first name.

racketeering; and that the evidence was insufficient for the jury to find Tawalbeh, Obadya, and Rayed guilty of using a destructive device during and in relation to a crime of violence, in violation of 18 U.S.C.A. § 924(c) (West Supp. 1999) and 18 U.S.C.A. § 2 (West 1969). Several Appellants also assert that the district court erred at sentencing. Finding no error, we affirm Appellants' convictions and sentences.

I.

According to the Government's theory of the case, Appellants were members of an organization loosely termed the "Abed organization" that committed various federal crimes in Roanoke, Virginia and the surrounding area. Joseph and his brother Abed Abedjalil were the alleged leaders of the conspiracy.[2] Rayed is Joseph's son; Amar, Obadya, and Thaier are Abedjalil's sons. Rayed, Amar, Obadya, and Thaier were referred to as "the boys" by Joseph and Abedjalil. Although "the boys" acted autonomously in the commission of many offenses, a number of crimes they committed were at the behest of Joseph and Abedjalil, furthering the fathers' interests. Fahad Tawalbeh was an associate of the Abed family who maintained close contact with Joseph and shared some affiliation with "the boys."

Rayed, Amar, Obadya, and Thaier participated in illegal drug-trafficking activities. Beginning in 1992, "the boys" distributed marijuana and cocaine powder from family-owned businesses in Roanoke and the surrounding area, including Tolley's Bar, Guys and Dolls Nightclub, and Pizza King Restaurant. These four Appellants also conducted drug transactions from their residence in Roanoke. In addition to dealing drugs themselves, "the boys" frequently burglarized the residences of other local drug dealers in order to obtain drugs for sale and for personal use. Moreover, "the boys" did not limit their illegal activities to drug trafficking. Issam Ottallah, an unindicted co-conspirator, testified that he and Amar would often beat and rob patrons of Tolley's Bar and that he, Amar, Obadya, and Thaier would often burglarize cars in its parking lot and steal guns and other valuables. According to Ottallah, he and "the boys" would give the stolen

_____

[2] Abedjalil was also named in the indictment but was acquitted by the jury of all counts against him.

4

goods to Joseph, who would resell them at his pancake house. Several witnesses testified that in December 1993, Obadya burglarized Dave's Market, a convenience store, and along with Rayed and Ottallah, sold the stolen goods to Abedjalil, who used the goods to stock a convenience store he owned.

Joseph owned property that contained Tolley's Bar and an apartment complex. Joseph and Abedjalil were unable to keep Tolley's Bar solvent and Joseph was unable to maintain current payments on the loan he took out to purchase the property. As a result, the lending bank foreclosed on the property during the summer of 1992. Shortly after news of the imminent foreclosure became public, William Bowyer, owner of Central Motors, a business that was located adjacent to Tolley's Bar, purchased the property. Donna Abed, Joseph's daughter-in-law, testified that Joseph went "ballistic" after learning that Bowyer had purchased the property. Although Bowyer purchased the property in May 1992, he did not send Joseph an eviction notice until July 1, 1992. Ottallah testified that in July 1992, Joseph convened a meeting with Ottallah, Amar, Obadya, Thaier, and Ronald Jones.[3] At that meeting, Joseph stated that he wanted Central Motors to be burned that night. Joseph then gave money to Amar and told him to buy gasoline and to burn Central Motors after all the customers had left Tolley's Bar.

Jones testified that Amar and Ottallah instructed him and Thaier to slash tires at the Central Motors parking lot. In accordance with those instructions, Thaier and Jones went to Central Motors and began to slash tires. Thaier deliberately cut his hand in an effort to avoid further participation in the offense and was told by Amar to go back to the bar. Jones also testified that he, Amar, and Ottallah then went to a gasoline station to purchase gasoline for the fire. Amar and Jones then sprayed the entire Central Motors lot with gasoline. Before the fire could be started, however, the police arrived, and all the participants fled the scene.

Tawalbeh owned a convenience store named Speedway Market. Cheryl Lyons, a teenage prostitute, testified that Tawalbeh was active in the illegal drug trade and allowed drug dealers to hide drugs in his

_____

[3] Jones was not named in the indictment.

store when the police were in the area. Lyons testified that in exchange for crack cocaine, she provided sexual favors to Tawalbeh. Lyons also testified that she purchased marijuana from Amar and Obadya, either at Guys and Dolls Nightclub or Speedway Market. Pamela DeGeorge, a federal undercover agent, testified that in 1992, she investigated Speedway Market for illegal food stamp trafficking and that Tawalbeh arranged for her to sell her food stamps to Amar. DeGeorge also testified that Tawalbeh told her that he could obtain crack cocaine and marijuana for her but that she had declined his offer.

In the fall of 1994, Tawalbeh became upset because he thought that the business at Speedway Market was suffering due to competition from the Corner Store, a convenience store located across the street. Tawalbeh propositioned several individuals about eliminating the competition by burning down the Corner Store. Michael Witt, a customer of Speedway Market, testified that Tawalbeh asked him to burn down the Corner Store "several times" and told him to use a Molotov cocktail to do so. Ottallah testified that both Joseph and Tawalbeh asked him to burn down the Corner Store and offered him $5,000 for the job. Tawalbeh and Amar subsequently agreed that Amar would burn down the Corner Store. Amar brought Obadya, Rayed, and Richard Chisom, one of his associates, into the scheme. Chisom testified that a week before the fire at the Corner Store, he, Amar, Obadya, and Rayed met with Tawalbeh and Joseph at the Speedway Market, where a conversation in Arabic occurred. Amar subsequently translated the conversation for Chisom, informing him that Tawalbeh wanted the Corner Store burned because it was taking away business from the Speedway Market, that he would pay $2,000 for the job, and that the Corner Store would be burned with a Molotov cocktail.

After scouting the Corner Store, Amar, Obadya, Rayed, and Chisom decided that they would toss a Molotov cocktail through the back window of the Corner Store into the stockroom. On January 13, 1995, they carried out their plan. Chisom testified that Rayed made the Molotov cocktail with a wine bottle, a rag, and some gasoline. Rayed dropped Chisom and Amar off in the alley behind the Corner Store, while Obadya served as a lookout at the front of the alley. After Chisom broke the window with a rock, Amar lit the Molotov cocktail, and Chisom threw it into the store. The conspirators met at their car,

6

circled around the block, and returned to Chisom's apartment. The fire "completely burnt out" the Corner Store. (J.A. at 352.)

In August 1995, Joseph opened a pancake house on Jefferson Street (the Jefferson Street Pancake House) on property leased from CW Francis & Son. The five-year lease required Joseph to pay $2,000 per month in rent plus real estate taxes and insurance, and to pay five years rent in the event of a default. The lease also contained a rent abatement clause if the building was destroyed by fire. CW Francis & Son maintained insurance on the property and business interruption insurance on the income from the property, and required all tenants to name CW Francis & Son as an additional insured on their insurance. In September 1995, Joseph purchased a $50,000 insurance policy to cover personal property and glass at the restaurant.

Toward the end of 1995, business began to slow down and Joseph was having difficulty paying his food service creditors. According to William Trinkle, President of CW Francis & Son, Joseph's rent payment history was poor. Joseph was late in paying the insurance and rent for October 1995. On October 27, 1995, CW Francis & Son filed a summons for unlawful detainer and began eviction proceedings against Joseph. On that same day, CW Francis & Son sued Joseph for the October and November rent in the amount of $4,000, a $400 late fee, $619.48 for real estate taxes, and $30 in court costs. After Joseph failed to pay his outstanding rent and late fees in full, CW Francis & Son filed a writ of possession and a levy, and obtained an eviction order that required Joseph to vacate the premises by December 22.

On December 18, 1995, four days before the scheduled eviction, a fire broke out at the Jefferson Street Pancake House. The firemen reporting to the scene testified that both the front and rear doors to the pancake house were locked. The assistant fire marshal testified that the amount of inventory at the pancake house was minimal. Based upon the presence of accelerants and the gas being left on, the assistant fire marshal concluded that the fire was an act of arson. Although a proof of loss was filed on Joseph's behalf by the agent of the insurance company that sold Joseph the $50,000 policy, no payment was made under that claim. CW Francis & Son received a total of $78,678.62 as a result of the fire, from both building insurance and business interruption insurance. CW Francis & Son decided not to

7

restore the pancake house, and the building was razed to make room for a parking lot.

Appellants were charged in a twelve-count indictment with committing various federal crimes arising out of the activities of the Abed organization. Counts One and Two charged all Appellants with a substantive RICO offense, 18 U.S.C.A. § 1962(c) (West 1984), and conspiracy to violate RICO, 18 U.S.C.A. § 1962(d) (West Supp. 1999), respectively. Counts Three and Four charged Joseph, Amar, Obadya, Rayed, and Thaier with conspiracy to commit arson, in violation of 18 U.S.C.A. § 371 (West Supp. 1999), and attempted arson, in violation of 18 U.S.C.A. § 844(i) (West Supp. 1999) and 18 U.S.C.A. § 2 (West 1969), respectively, of Central Motors. Counts Five and Six charged these Appellants with conspiracy to commit arson, in violation of 18 U.S.C.A. § 371, and arson, in violation of 18 U.S.C.A. § 844(i) and 18 U.S.C.A. § 2, respectively, of Mixers Restaurant and Lounge.[4] Counts Seven and Eight charged these Appellants with wire fraud, in violation of 18 U.S.C.A. § 1343 (West Supp. 1999) and 18 U.S.C.A. § 2, and of 18 U.S.C.A. § 844(h) (West Supp. 1999) and 18 U.S.C.A. § 2, respectively, in connection with the arson of Mixers Restaurant and Lounge. Counts Nine and Ten charged Joseph, Amar, Obadya, Rayed, and Tawalbeh with conspiracy to commit arson, in violation of 18 U.S.C.A. § 371, and arson, in violation of 18 U.S.C.A. § 844(i) and 18 U.S.C.A. § 2, respectively, of the Corner Store. Count Eleven charged these Appellants with use of a destructive device during and in relation to a crime of violence, in violation of 18 U.S.C.A. § 924(c) (West Supp. 1999) and 18 U.S.C.A.§ 2, relating to the use of a Molotov cocktail in the Corner Store arson. Count Twelve charged all Appellants with conspiracy to distribute cocaine and marijuana, in violation of 21 U.S.C.A. § 846 (West 1999).

Following a thirty-five day trial, which included ten days of deliberation, the jury returned its verdict. The jury convicted Joseph on Counts One, Two, Three, and Four. The jury found that Joseph had committed the predicate racketeering acts of arson of the Jefferson Street Pancake House and attempted arson of Central Motors. The

_____

[4] Mixers Restaurant and Lounge was owned by Riyadh Mahmoud Gibriel and Ahmad Thiab, who were also named in the indictment but acquitted by the jury of all counts against them.

8

jury acquitted Joseph on Counts Five through Twelve. The jury convicted Amar on Counts One, Two, Three, Four, Nine, Ten, Eleven, and Twelve. The jury found that Amar had committed the predicate racketeering acts of arson of the Corner Store, attempted arson of Central Motors, robbery, and drug conspiracy. The jury acquitted Amar on Counts Five through Eight. The jury convicted Obadya and Rayed on Counts One, Two, Nine, Ten, Eleven, and Twelve. The jury found that they had committed the predicate racketeering acts of arson of the Corner Store and drug conspiracy. The jury acquitted them on Counts Three through Eight. The jury convicted Thaier on Counts Two, Three, and Twelve and acquitted him on Count One and Counts Four through Eight. Finally, the jury convicted Tawalbeh on Counts Nine, Ten, and Eleven and acquitted him on Counts One, Two, and Twelve. Appellants received sentences ranging from 92 months to 570 months.

Appellants jointly and individually assert a number of different grounds for reversal on appeal. With regard to the district court's actions at trial, Joseph, Obadya, and Rayed argue that the district court erred by refusing to give their requested jury instruction on the proof necessary to find one guilty of RICO conspiracy under 18 U.S.C.A. § 1962(d). In addition, Appellants assert several sufficiency-of-the-evidence claims. Joseph, Amar, Obadya, and Rayed argue that the evidence was insufficient to sustain their convictions for the substantive RICO violation and for RICO conspiracy. Joseph argues that the evidence was insufficient to sustain the jury's finding that he committed the predicate acts of arson and attempted arson. Tawalbeh, Obadya, and Rayed argue that the evidence was insufficient to sustain their convictions for use of a destructive device during and in relation to a crime of violence.

Several Appellants also argue that the district court erred in calculating their sentences. Joseph argues that the district court erred in setting his base offense level at 24, pursuant to U.S. Sentencing Guidelines Manual § 2K1.4(a)(1) (1998), based upon its finding that the attempted arson of Central Motors created a substantial risk of death or serious bodily injury and that Joseph knowingly created that risk. Joseph also argues that the district court erred in enhancing his offense level by four levels, pursuant to U.S.S.G.§ 3B1.1(a), based upon its finding that he was an organizer and leader of an attempted

9

arson of Central Motors that included five or more participants. Amar argues that the district court erred in using his food stamp fraud conviction as a prior offense in calculating the criminal history portion of his guideline sentence. Finally, Tawalbeh, Obadya, and Rayed argue that the district court erred in sentencing them to mandatory, consecutive thirty-year sentences under 18 U.S.C.A.§ 924(c) for using a Molotov cocktail to commit the Corner Store arson.

We now address these arguments.**5**

_____

**5** Appellants also argue that the district court erred by (1) denying their pretrial motion to dismiss Counts One and Two of the indictment on the ground that the RICO pattern element was unconstitutionally vague as applied to the facts of this case; (2) admitting evidence of Appellants' uncharged crimes as proof of the existence and structure of the charged racketeering enterprise; (3) admitting oral statements and nonverbal conduct of witnesses concerning the Corner Store fire; (4) failing to give a separate Pinkerton instruction, see Pinkerton v. United States, 328 U.S. 640 (1946), on co-conspirator liability; and (5) denying their motion for a new trial on the ground that the Government's plea agreements with cooperating witnesses violated 18 U.S.C.A. § 201(c)(2) (West Supp. 1999), the anti-gratuity statute. Tawalbeh asserts that the district court erred by refusing to give the jury his requested instruction on the use of co-conspirator statements. Thaier contends that the district court erred by refusing to give his requested instruction on duress.

We have carefully considered these arguments and find them meritless. See United States v. Bennett, 984 F.2d 597, 606-07 (4th Cir. 1993) (upholding "pattern of racketeering" requirement in the RICO statute against vagueness challenge because statute provided defendants with adequate notice that acts of arson, fraud, attempted murder, perjury, and obstruction of justice that were committed to allow the enterprise to continue to defraud insurance companies "fell within those acts contemplated by a RICO enterprise and a RICO conspiracy to participate in the affairs of such an enterprise"); United States v. Salerno, 108 F.3d 730, 738-39 (7th Cir. 1997) (holding that because the existence of an enterprise is an essential element of the RICO offense, evidence that goes to establish an enterprise's existence and a defendant's participation in it is not "other crimes" evidence subject to Federal Rule of Evidence 404(b)); United States v. Levine, 5 F.3d 1100, 1107 (7th Cir. 1993) (noting that extrajudicial statements implicating defendant in a crime were properly admitted as nonhearsay because they were offered not for their truth but

10

II.

Joseph, Obadya, and Rayed first argue that the district court erred in its instruction to the jury on the proof necessary to find one guilty of RICO conspiracy. See 18 U.S.C.A. § 1962(d) (West Supp. 1999). At the close of trial, the district court instructed the jury that to establish guilt under § 1962(d) (Count Two) the Government was required to prove beyond a reasonable doubt the following:

> One, a conspiracy or agreement existed, as detailed in Count Two, to participate in the affairs of an enterprise that affected interstate commerce through a pattern of racketeering activity; two, the particular defendant deliberately enjoined -- deliberately joined or became a member of a conspiracy or agreement with knowledge of its purpose; and, three, the particular defendant knew at the time he joined the conspiracy or at some later time while he still was a member that someone, not necessarily the defendant, would commit at least two of the racketeering acts detailed in the indictment in furtherance of the racketeering scheme.

(J.A. at 3832.) The district court further instructed the jury that to meet its burden under this Count, the Government was required to prove that "the defendant knowingly adopted the goal of furthering or facilitating the criminal endeavor," or in other words, that "the defendant knew about the pattern of racketeering activity and agreed to

_____

to show defendant's motive to murder the declarants); United States v. Aramony, 88 F.3d 1369, 1379-81 (4th Cir. 1996) (upholding sufficiency of Pinkerton instruction substantially similar to one given by district court here); United States v. Richardson, 1999 WL 686892, *2-*5 (4th Cir. Sept. 3, 1999) (rejecting argument that § 201(c)(2) applies to plea agreements between Government and witnesses); United States v. Smith, 44 F.3d 1259, 1270-71 (4th Cir. 1995) (holding that district court is not required to give defendant's particular form of instruction so long as the instruction the court gives fairly states the controlling law); United States v. Sarno, 24 F.3d 618, 621 (4th Cir. 1994) (holding that court can refuse to instruct the jury on the duress defense if the defendant fails to proffer sufficient evidence as a matter of law to support an element of the defense).

11

facilitate the racketeering scheme," but was not required "to prove that the defendant himself committed or agreed to commit two or more acts of racketeering." (J.A. at 3833.) Rayed objected to the third part of the initial instruction on behalf of Appellants and requested that the district court instruct the jury that the Government was required to prove that the defendant agreed that someone would commit at least two racketeering acts. The district court overruled this objection.

On appeal, Joseph, Obadya, and Rayed renew this objection, arguing that the district court misinterpreted United States v. Salinas, 118 S. Ct. 469 (1997), when it stated that a defendant need not have agreed that someone would commit two predicate acts to be convicted of RICO conspiracy. These Appellants assert that Salinas only held that a defendant need not have agreed personally to commit two predicate acts to be convicted of RICO conspiracy. In support of their interpretation, these Appellants cite a Seventh Circuit case, Goren v. New Vision Int'l, Inc., 156 F.3d 721 (7th Cir. 1998), decided after Salinas, in which that court held that the defendant must have agreed that someone would commit at least two predicate acts. Joseph, Obadya, and Rayed assert that the district court's failure to give the requested instruction warrants reversal of their convictions on Count Two.

"This [C]ourt reviews jury instructions in their entirety and as part of the whole trial." United States v. Bostian, 59 F.3d 474, 480 (4th Cir. 1995). In a criminal case, this Court examines "`whether the court adequately instructed the jury on the elements of the offense and the accused's defenses.'" Id. (quoting United States v. Fowler, 932 F.2d 306, 317 (4th Cir. 1991)). "Both the decision to give (or not to give) a jury instruction and the content of an instruction are reviewed for abuse of discretion." United States v. Russell, 971 F.2d 1098, 1107 (4th Cir. 1992). As this Court has noted:

> A refusal to grant a requested instruction is only reversible error if the instruction (1) was correct; (2) was not substantially covered by the court's charge to the jury; and (3) dealt with some point in the trial so important, that failure to give the requested instruction seriously impaired the defendant's ability to conduct his defense.

12

United States v. Patterson, 150 F.3d 382, 388 (4th Cir. 1998), cert. denied, 119 S. Ct. 835 (1999). In sum, this Court's review is "whether, taken as a whole, the instruction [given] fairly states the controlling law." United States v. Cobb, 905 F.2d 784, 789 (4th Cir. 1990).

In Salinas, the Supreme Court addressed the defendant's argument that to prove guilt on a charge of conspiracy to violate RICO, the Government needed to prove that the defendant himself committed or agreed to commit the two predicate acts required for a substantive RICO offense under § 1962(c). See 118 S. Ct. at 476. The Supreme Court rejected this argument, holding that "[a] conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." Id. at 477 (emphasis added). Applying this standard to the facts of the case, the Court upheld the defendant's conviction under § 1962(d), because even though he did not commit or agree to commit the two predicate acts of acceptance of bribes, he "knew about and agreed to facilitate the scheme." Id. at 478.

In Goren, the Seventh Circuit addressed the applicability of Salinas in the context of a civil RICO complaint. The Seventh Circuit con- cluded that a viable claim under § 1962(d) requires "that each defen- dant agree[ ] to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racke- teering activity" and "that each defendant further agree[ ] that some- one would commit at least two predicate acts to accomplish those goals." Goren, 156 F.3d at 732. Focusing on the latter requirement, Joseph, Obadya, and Rayed argue that the district court erred as a matter of law by refusing to instruct the jury that to convict Appel- lants of RICO conspiracy under § 1962(d), it needed to find that each Appellant agreed that someone would commit at least two predicate acts.

We believe that Appellants' focus on Goren leads them to take an overly narrow view of the district court's instruction on Count Two. As the Supreme Court has noted, "instructions must be evaluated not in isolation but in the context of the entire charge." Jones v. United States, 119 S. Ct. 2090, 2103 (1999). In addition to instructing the

13

jury that, to sustain its burden of proof for RICO conspiracy, the Government had to prove beyond a reasonable doubt that the particular defendant knew that someone would commit at least two predicate racketeering acts in furtherance of the racketeering scheme, the district court also instructed the jury that the Government was required to prove that (1) a conspiracy existed, (2) the particular defendant deliberately joined the conspiracy with knowledge of its purpose, and (3) the defendant knowingly adopted the goal of furthering or facilitating the criminal endeavor. This instruction, viewed in its entirety, is almost identical to the jury instruction the Supreme Court upheld in Salinas, which also did not specifically mention that the Government was required to prove that the defendant agreed that someone would commit two predicate acts.[6] The instruction in the instant case is also virtually identical to the Supreme Court's characterization of the requirements of RICO conspiracy. See Salinas , 118 S. Ct. at 477 ("A conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopt the goal of furthering or facilitating the criminal endeavor."). Accordingly, we hold that the district court's jury instruction on the proof necessary to find one guilty of RICO conspiracy, 18 U.S.C.A. § 1962(d), fairly stated the controlling law and was not reversible error.

III.

Appellants next assert several sufficiency-of-the-evidence claims. Joseph, Amar, Obadya, and Rayed argue that the Government's evidence was insufficient to convict them of the substantive RICO offense, 18 U.S.C.A. § 1962(c) (West 1984), and of RICO conspiracy, 18 U.S.C.A. § 1962(d) (West Supp. 1999). Joseph contends that the Government's evidence was insufficient for the jury to find that

_____

[6] The trial court's instruction on the RICO conspiracy count stated:

> What you are being asked to decide in Count Two is .. . If Salinas was only involved in one or two or even none, did he, nevertheless, know about this pattern. Did he know that this whole pattern of activity was going on and did he then knowingly and willfully join in and participate and contribute in some fashion.

United States v. Marmolejo, 89 F.3d 1185, 1195 n.16 (5th Cir. 1996).

14

he committed the two predicate racketeering acts of arson of the Jefferson Street Pancake House and attempted arson of Central Motors. Tawalbeh, Obadya, and Rayed assert that the Government's evidence was insufficient to convict them of using a destructive device during and in relation to a crime of violence, in violation of 18 U.S.C.A. § 924(c) (West Supp. 1999) and 18 U.S.C.A.§ 2 (West 1969), relating to the arson of the Corner Store.

When reviewing a sufficiency-of-the-evidence claim, we will sustain the jury's verdict "if there is substantial evidence, taking the view most favorable to the Government, to support it." Glasser v. United States, 315 U.S. 60, 80 (1942). "[S]ubstantial evidence is evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996) (en banc). With this standard of review in mind, we address Appellants' arguments seriatim.

A.

Joseph, Amar, Obadya, and Rayed first argue that the Government's evidence was insufficient to convict them of the substantive RICO offense, 18 U.S.C.A. § 1962(c) (West 1984), and of RICO conspiracy, 18 U.S.C.A. § 1962(d) (West Supp. 1999), because the evidence did not demonstrate that they acted as a continuing unit with a common purpose. Rather, these Appellants argue, the evidence demonstrated that each Appellant acted in his own self-interest. Joseph similarly contends that his verdicts of acquittal on Counts Five through Twelve indicate that the jury rejected all evidence that suggested that he associated with the other Appellants in the period between the attempted arson of Central Motors in 1992 and the arson of the Jefferson Street Pancake House in 1995, and, furthermore, that there is no evidence that he conspired with any other members of the Abed family with regard to the pancake house arson. Joseph thus asserts that the predicate acts the jury found that he committed had no connection to the alleged enterprise. Also along those lines, Amar, Obadya, and Rayed argue that the predicate acts the jury found that they committed -- drug conspiracy and the arson of the Corner Store -- do not form a pattern of racketeering activity because they had no relation to each other. The goal of the arson at the Corner Store, these

15

Appellants contend, was to eliminate lawful competition, not to facilitate the drug conspiracy.

The substantive RICO statute provides as follows:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C.A. § 1962(c). An "enterprise" is a "group of persons associated together for a common purpose of engaging in a course of conduct," which may be proved "by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." United States v. Turkette, 452 U.S. 576, 583 (1981). This Court has noted that a RICO enterprise is characterized by "continuity, unity, shared purpose, and identifiable structure." United States v. Fiel, 35 F.3d 997, 1003 (4th Cir. 1994) (internal quotation marks omitted).

A "pattern of racketeering activity" requires "at least two acts of racketeering activity" occurring within a ten-year period, 18 U.S.C.A. § 1961(5) (West 1984), that are related and amount to or pose a threat of continued criminal activity, see H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239 (1989). Predicate racketeering acts are related if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." Id. at 240. The relatedness requirement is satisfied so long as the Government shows that the predicate acts are related to the affairs of the enterprise, even if the acts are not directly related to each other. See United States v. Masters, 924 F.2d 1362, 1366 (7th Cir. 1991); United States v. Angiulo, 897 F.2d 1169, 1180 (1st Cir. 1990); United States v. Indelicato, 865 F.2d 1370, 1383 (2d Cir. 1989). Continuity may be shown by "a closed period of repeated conduct, or. . . past conduct that by its nature projects into the future with a threat of repetition." H.J. Inc., 492 U.S. at 241. "In other cases the threat of continuity may

16

be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business." Id. at 242.

As an initial matter, we conclude that viewing the record in the light most favorable to the Government, substantial evidence supports the conclusion that Appellants acting in concert constituted a racketeering enterprise. The Government presented evidence that "the boys" committed several burglaries and either gave or sold the stolen goods to Joseph and Abedjalil and that "the boys" sold drugs and robbed customers at businesses owned by Joseph and Abedjalil. The Government also presented evidence that Joseph, Abedjalil, and Tawalbeh used arson to gain insurance money and to intimidate business rivals, and that they recruited "the boys" to commit these arsons. This evidence is sufficient for a reasonable factfinder to conclude that Appellants constituted an ongoing organization with a definite structure, with Joseph, Abedjalil, and Tawalbeh giving orders and "the boys" executing them, and that Appellants possessed the shared purpose of enriching the members of the enterprise and preserving the power of the enterprise.

Viewing the record in the light most favorable to the Government, we conclude that substantial evidence supports the conclusion that Joseph was associated with the Abed organization. The Government introduced evidence that "the boys" burglarized cars in Tolley's Bar and brought the stolen goods to Joseph for resale at his pancake house. This evidence is sufficient for a reasonable factfinder to conclude that Joseph had an ongoing association with"the boys," and by implication, with the enterprise. The attempted arson of Central Motors and the arson of the Jefferson Street Pancake House provide a further connection between Joseph and the enterprise, namely that arson was one of the enterprise's favorite ways to get insurance money and deal with business rivals. The fact that the jury did not find that any member of the enterprise conspired with Joseph to commit the arson of the pancake house is irrelevant because the RICO statute does not require that a defendant commit a predicate act with another individual. Moreover, this arson evidence is sufficient to support a reasonable factfinder's conclusion that because each predicate act occurred shortly after Joseph received an eviction notice from the person about to take possession of his property, these acts were related in purpose. Moreover, because arson was one of the enter-

17

prise's regular ways of doing business, the continuity requirement was satisfied. Accordingly, we hold that the Government's evidence was sufficient to convict Joseph of the substantive RICO offense, 18 U.S.C.A. § 1962(c).

Viewing the record in the light most favorable to the Government, we conclude that substantial evidence supports the conclusion that the drug conspiracy and the arson of the Corner Store constituted a pattern of racketeering activity. The Corner Store was a competitor of Speedway Market, which was owned by Tawalbeh. The Government presented evidence that the Abed organization engaged in drug dealing and food stamp fraud at Speedway Market. This evidence is sufficient to support a reasonable factfinder's conclusion that the drug conspiracy and the Corner Store arson were both related to the affairs of the enterprise because the arson was committed to eliminate a competitor of Speedway Market that threatened the illegal ventures of the enterprise. Because arson was one of the enterprise's regular ways of doing business, the continuity requirement was satisfied. Accordingly, we hold that the Government's evidence was sufficient to convict Amar, Obadya, and Rayed of the substantive RICO offense, 18 U.S.C.A. § 1962(c).

Finally, the RICO conspiracy statute provides that "[i]t shall be unlawful for any person to conspire to violate" the RICO statute. 18 U.S.C.A. § 1962(d). "To prove a RICO conspiracy the government must establish (1) that two or more people agreed to commit a substantive RICO offense and (2) that the defendant knew of and agreed to the overall objective of the RICO offense." United States v. Posada-Rios, 158 F.3d 832, 857 (5th Cir. 1998). Because the evidence viewed in the light most favorable to the Government was sufficient to support the convictions of Joseph, Amar, Obadya, and Rayed on the substantive RICO count, and, moreover, was sufficient to show that each of these Appellants knew about and agreed to facilitate the substantive RICO offense, we hold that the Government's evidence was sufficient to support their convictions for RICO conspiracy under § 1962(d). See United States v. Salinas, 118 S. Ct. 469, 478 (1997); see also United States v. Starrett , 55 F.3d 1525, 1549 (11th Cir. 1995) (holding that because evidence was sufficient to support defendants' convictions under § 1962(c), and the jury could infer from the evidence that defendants each manifested an agreement to

18

participate in the affairs of the RICO enterprise through a pattern of racketeering activity, the evidence was sufficient to support defendants' convictions for RICO conspiracy under § 1962(d)).

B.

Joseph also asserts that the Government's evidence was insufficient for the jury to find that he committed Racketeering Act Fourteen, arson of the Jefferson Street Pancake House, and Racketeering Act Six, attempted arson of Central Motors. With regard to the pancake house arson, Joseph argues that the evidence adduced at trial revealed that the owner of the building had a greater motive and opportunity to commit the arson than did Joseph. In particular, Joseph argues that he personally did not have an incentive to burn the pancake house to terminate the lease because the lease was already breached by his failure to pay rent. Moreover, Joseph asserts that the owner also had keys to the building and received a direct and significant benefit from the fire in the form of insurance benefits and proceeds from the subsequent sale of the property. With regard to the attempted arson of Central Motors, Joseph argues that the only witness who implicated him in this crime was Ottallah, whose testimony was not credible as evidenced by the jury's acquittal of Joseph on Counts Five through Twelve and of Thaier on Counts One and Four.[7] Joseph further argues that Jones's testimony clearly established that Joseph was not involved in any manner with the attempted arson of Central Motors.

Viewed in the light most favorable to the Government, the evidence is sufficient to support a reasonable factfinder's conclusion that Joseph committed the arson of the Jefferson Street Pancake House. The pancake house's business was failing and Joseph was having difficulty paying food service creditors. According to the terms of the lease, if Joseph defaulted he would be liable for the full amount of rent due. A rent abatement clause, however, provided that if the building was destroyed by an accidental fire, Joseph would not be in default and the lease payments would cease. Moreover, Joseph pos-

---

[7] Joseph also argues that the jury's acquittal of Thaier on Count Three, conspiracy to commit arson of Central Motors, indicates that Ottallah's testimony was not credible. In fact, the jury convicted Thaier on Count Three.

19

sessed a $50,000 insurance policy on the contents of the restaurant. Joseph also possessed a key to the building and the assistant fire marshal concluded that the arson was an inside job. Finally, the arson of the pancake house was strikingly similar to the attempted arson of Central Motors, in that each occurred shortly after Joseph learned he would be evicted. Accordingly, we hold that the evidence was sufficient for the jury to find that Joseph committed Racketeering Act Fourteen, arson of the Jefferson Street Pancake House.

Viewed in the light most favorable to the Government, the evidence also is sufficient to support a reasonable factfinder's conclusion that Joseph was involved in the attempted arson of Central Motors. Joseph was enraged at the owner of Central Motors for purchasing his property. Moreover, as previously noted, the attempted arson of Central Motors was strikingly similar to the arson of the Jefferson Street Pancake House. Joseph's argument again rests upon his contention that the only witness who implicated him in this crime, Ottallah, was not credible as evidenced by the jury's rejection of Ottallah's testimony with regard to other counts involving Joseph and Thaier. This Court, however, does not review the credibility of witnesses when evaluating whether sufficient evidence existed to support a conviction. See United States v. Wilson, 115 F.3d 1185, 1190 (4th Cir. 1997). Moreover, a defendant cannot challenge his conviction merely because it is inconsistent with a verdict of acquittal on another count. See United States v. Powell, 469 U.S. 57, 62-64 (1984). As the Supreme Court noted in Powell, it is possible that inconsistent verdicts are a product of a jury's "mistake, compromise, or lenity." 469 U.S. at 65. Accordingly, we hold that the evidence was sufficient for the jury to find that Joseph committed Racketeering Act Six, the attempted arson of Central Motors.

C.

Tawalbeh, Obadya, and Rayed argue that the Government's evidence was insufficient to convict them of using a destructive device during and in relation to a crime of violence, in violation of 18 U.S.C.A. § 924(c) (West Supp. 1999) and 18 U.S.C.A. § 2 (West 1969), relating to the arson of the Corner Store. These Appellants do not dispute that the arson itself satisfies the elements of § 924(c). Rather, Tawalbeh argues that he could not be convicted as a principal

20

because he had no direct involvement with the Molotov cocktail and could not be convicted as an aider and abettor because he did not directly facilitate or encourage the use of a Molotov cocktail. Moreover, Tawalbeh asserts, he could not be convicted under a Pinkerton theory of vicarious liability because the use of a Molotov cocktail was never discussed in his presence and was not reasonably foreseeable.**8** Obadya and Rayed argue that the Government failed to prove that either of them individually "used" the Molotov cocktail in the arson, and moreover, they could not be convicted under the Pinkerton doctrine of co-conspirator liability because that doctrine applies only to substantive offenses and § 924(c) is a sentence enhancement provision.

A defendant may be found guilty of aiding and abetting a § 924(c) violation if the defendant "participat[es] at some stage [of the illegal venture] accompanied by knowledge of the result and intent to bring about that result." United States v. Wilson , 135 F.3d 291, 305 (4th Cir.) (internal quotation marks omitted), cert. denied, 118 S. Ct. 1852 (1998). The defendant need not be present at every stage of the illegal venture. See id. Indeed, the defendant need not even be present when the crime is committed to be guilty of aiding and abetting. See United States v. Ellis, 121 F.3d 908, 924 (4th Cir. 1997). Moreover, contrary to Appellants' argument, a defendant may be convicted of a § 924(c) violation on the basis of Pinkerton liability if the use of a firearm "was in furtherance of the conspiracy and was reasonably foreseeable to the defendant." Wilson, 135 F.3d at 305.

Viewing the record in the light most favorable to the Government with regard to Tawalbeh, we conclude that substantial evidence supports Tawalbeh's conviction for violating § 924(c) under either an aider-and-abettor theory or a Pinkerton theory. Michael Witt, a customer of the Speedway Market, testified that Tawalbeh asked him to burn down the Corner Store "several times" and told him to use a Molotov cocktail to do so. According to Chisom, the conspirators had

---

**8** In Pinkerton v. United States, 328 U.S. 640 (1946), the Supreme Court upheld the conviction of a defendant for acts committed by the defendant's co-conspirator that were "done in furtherance of the conspiracy" and that could have been "reasonably foreseen as a necessary and natural consequence of the conspiracy." Id. at 647-48.

21

a meeting with Tawalbeh a week before the Corner Store fire and conversed in Arabic. Amar subsequently translated the conversation for Chisom, informing him that Tawalbeh wanted the Corner Store burned because it was taking away business from the Speedway Market, that he would pay $2,000 for the job, and that the Corner Store would be burned with a Molotov cocktail. This testimony is sufficient to support a reasonable factfinder's conclusion that Tawalbeh participated at the planning stage in the illegal use of a Molotov cocktail, had knowledge of the result, and intended to bring about that result. In any event, under a <u>Pinkerton</u> theory of liability, it was certainly reasonably foreseeable to Tawalbeh that the conspirators would use a Molotov cocktail to burn down the Corner Store and that the destruction of a competitor, the Corner Store, was in furtherance of the conspiracy. Accordingly, we hold that the Government's evidence was sufficient to convict Tawalbeh of using a destructive device during and in relation to a crime of violence, in violation of 18 U.S.C.A. § 924(c) and 18 U.S.C.A. § 2.

Viewing the record in the light most favorable to the Government with regard to Obadya and Rayed, we conclude that substantial evidence supports Obadya's and Rayed's convictions for violating § 924(c) as aiders and abettors. According to Chisom's testimony, Rayed constructed the Molotov cocktail and drove the conspirators to the Corner Store, and Obadya served as a lookout during the commission of the arson. This testimony is certainly sufficient to support a reasonable factfinder's conclusion that Obadya and Rayed participated in the illegal use of a Molotov cocktail, had knowledge of the result, and intended to bring about that result. Because substantial evidence supports Obadya's and Rayed's conviction under an aider-and-abettor theory, it is wholly irrelevant that neither of them individually "used" the Molotov cocktail in the Corner Store arson. Accordingly, we hold that the Government's evidence was sufficient to convict Obadya and Rayed of aiding and abetting the use of a destructive device during and in relation to a crime of violence, in violation of 18 U.S.C.A. § 924(c) and 18 U.S.C.A. § 2.

IV.

Finally, several Appellants argue that the district court erred at sentencing. Joseph argues that the district court erred in (1) setting his

22

base offense level at 24, pursuant to U.S.S.G. § 2K1.4(a)(1), and (2) enhancing his offense level by four levels, pursuant to U.S.S.G. § 3B1.1(a). Amar argues that the district court erred in using his food stamp fraud conviction as a prior offense in calculating the criminal history portion of his guideline sentence. Finally, Tawalbeh, Obadya, and Rayed argue that the district court erred in sentencing them to mandatory, consecutive 30-year sentences under 18 U.S.C.A. § 924(c) for using a Molotov cocktail to commit the Corner Store arson.

To give due deference to a district court's application of the Sentencing Guidelines, we review factual determinations for clear error and legal questions de novo. See United States v. Blake, 81 F.3d 498, 503 (4th Cir. 1996). With this standard of review in mind, we address these Appellants' sentencing claims seriatim.

A.

First, Joseph argues that the district court erred in setting his base offense level at 24, pursuant to U.S.S.G. § 2K1.4(a)(1), based upon its finding that the attempted arson of Central Motors created a substantial risk of death or serious bodily injury and that Joseph knowingly created that risk. Joseph reasons that the district court erred because the attempted arson only involved a limited amount of gasoline on commercial property, no persons were on the property, and Joseph instructed the participants not to set the fire until patrons at the adjacent bar (Tolley's Bar) had left. Joseph contends that his clear intent was to avoid danger to any customers of Central Motors or Tolley's Bar, and, therefore, because he did not knowingly create a substantial risk of death or serious bodily injury, the correct base offense level should have been 20, pursuant to U.S.S.G.§ 2K1.4(a)(2).

Section 2K1.4(a)(1) of the Sentencing Guidelines provides that the base offense level for arson will be 24 if the defendant knowingly created a substantial risk of death or serious bodily injury to any person other than a participant in the offense. See U.S.S.G. § 2K1.4(a)(1). The risk includes the risk to fire fighters and other emergency and law enforcement personnel who respond to or investigate the fire. See U.S.S.G. § 2K1.4, comment. (n.2). The term"knowingly" is not defined in the Guidelines. See United States v. Karlic, 997 F.2d 564,

23

569 (9th Cir. 1993). In the past, the Supreme Court has looked to the Model Penal Code definition of "knowledge" in interpreting a criminal statute. See Turner v. United States, 396 U.S. 398, 416 n.29 (1970); Leary v. United States, 395 U.S. 6, 46 n.93 (1969). Accordingly, we agree with several circuits that have applied the Model Penal Code to define "knowingly" in § 2K1.4(a)(1) as being aware that it is "practically certain" that the criminal act will result in a substantial risk of death or serious bodily injury. See United States v. Johnson, 152 F.3d 553, 555-56 (6th Cir. 1998); United States v. Altier, 91 F.3d 953, 957 (7th Cir. 1996); United States v. Honeycutt, 8 F.3d 785, 787 (11th Cir. 1993); Karlic, 997 F.2d at 569. Under this standard, an attempted arson of commercial property containing automobiles with gasoline in their tanks warrants the application of § 2K1.4(a)(1), because a resulting fire would be massive and extremely dangerous to the responding fire fighters. See Altier, 91 F.3d at 957; Honeycutt, 8 F.3d at 788. The application of § 2K1.4(a)(1) is also warranted where the fire occurred close to a nearby dwelling and endangered the dwelling's inhabitants. See Johnson, 152 F.3d at 557.

In the present case, the Central Motors parking lot contained several automobiles, all presumably containing gasoline, and a successful arson attempt would have created a massive fire that would have threatened the lives and safety of responding firefighters and policemen. Moreover, Central Motors was located near Joseph's apartment complex behind Tolley's Bar, and a fire at Central Motors could easily have spread to those apartments and injured the residents. It is therefore irrelevant that Joseph planned to set the fire when nobody was on the Central Motors property and after all of Tolley's customers had left. Accordingly, we hold that the district court did not clearly err in setting Joseph's base offense level at 24, pursuant to § 2K1.4(a)(1).

B.

Next, Joseph argues that the district court erred in enhancing his offense level by four levels, pursuant to U.S.S.G.§ 3B1.1(a), based upon its finding that he was an organizer and leader of an attempted arson of Central Motors that included five or more participants -- Joseph, Ottallah, Jones, Amar, and Thaier. Joseph contends that Ottal-

24

lah's testimony, upon which the district court relied, was not credible as evidenced by the jury's acquittal of Thaier on Counts One and Four. Joseph argues that the only credible witness, Jones, established that only four individuals participated in the attempted arson of Central Motors, and Joseph was not one of them.

Section 3B1.1(a) of the Sentencing Guidelines provides for an enhancement of a defendant's offense level by four levels when the defendant was an organizer or leader of a criminal activity that involved five or more participants. See U.S.S.G. § 3B1.1(a). Ottallah testified at trial that Joseph directed him, Amar, Thaier, and Jones to burn Central Motors. Jones testified that Amar and Ottallah ordered him and Thaier to slash tires at Central Motors, that he and Thaier followed this instruction, and that he, Amar, and Ottallah obtained gas to burn Central Motors. Although Jones's testimony did not directly implicate Joseph, the district court could find Ottallah's testimony credible, see United States v. Hyppolite, 65 F.3d 1151, 1159 (4th Cir. 1995), and a district court's factual finding made on the basis of conflicting evidence is not reversible, see United States v. Falesbork, 5 F.3d 715, 721 (4th Cir. 1993). Accordingly, we hold that the district court did not clearly err in enhancing Joseph's offense level by four levels, pursuant to § 3B1.1(a), based upon his leadership or organizing role in the attempted arson of Central Motors.

C.

Amar argues that the district court erred in using his food stamp fraud conviction as a prior offense in calculating the criminal history portion of his guideline sentence. Amar contends that because the food stamp offense occurred during the time the racketeering was alleged to be occurring, and evidence of this offense was presented to the jury as evidence of racketeering, the food stamp fraud was relevant conduct that was part of the instant offense, and, thus, should not have been considered as a prior offense.

Section 4A1.1 of the Sentencing Guidelines provides that a district court should use a defendant's prior sentence of imprisonment in calculating his criminal history. See U.S.S.G.§ 4A1.1. Section 4A1.2(a)(1) of the Sentencing Guidelines defines a"prior sentence" as "any sentence previously imposed . . . for conduct not part of the

25

instant offense." U.S.S.G. § 4A1.2(a)(1)."Conduct that is part of the instant offense means conduct that is relevant conduct to the instant offense under the provisions of § 1B1.3 (Relevant Conduct)." U.S.S.G. § 4A1.2(a)(1), comment. (n.1). A conviction is properly considered a prior sentence under § 4A1.2(a)(1) if the prior sentence and present offense "involve conduct that is severable into two distinct offenses." United States v. McManus, 23 F.3d 878, 888 (4th Cir. 1994). Whether the prior sentence and present offense are severable requires a fact-specific inquiry that requires consideration of "the temporal and geographical proximity of the two offenses, common victims, and a common criminal plan or intent." United States v. Beddow, 957 F.2d 1330, 1338 (6th Cir. 1992).

In the present case, Amar's food stamp trafficking conviction is a severable, distinct offense from the racketeering offense because the racketeering offense was a complex crime that included a distinct organizational structure, had numerous participants, and lasted much longer than the food stamp fraud crime. Moreover, the racketeering offense and the food stamp fraud crime had different victims and did not have a common plan. Accordingly, we hold that the district court did not err in using Amar's food stamp trafficking convictions in calculating his criminal history.

D.

Tawalbeh, Obadya, and Rayed argue that the district court erred in sentencing them to mandatory, consecutive thirty-year sentences under 18 U.S.C.A. § 924(c) for using a Molotov cocktail to commit the Corner Store arson. These Appellants basically reiterate their arguments, see ante Part III.C, that they cannot be found guilty under a vicarious liability theory, even by a preponderance of the evidence, because the Pinkerton doctrine does not apply to a sentence enhancement provision such as § 924(c). These Appellants conclude that their sentences must be vacated for resentencing.

Section 2K2.4(a) of the Sentencing Guidelines provides that the term of imprisonment for a violation of § 924(c) is that required by statute. See U.S.S.G. § 2K2.4(a). Section 924(c)(1)(B)(ii) provides that a person who uses or carries a "destructive device" during and in relation to a crime of violence "shall be sentenced to a term of impris-

26

onment of not less than 30 years" in addition to the punishment provided by the crime of violence. 18 U.S.C.A. § 924(c)(1)(B)(ii) (West Supp. 1999). A "destructive device" in turn is defined in relevant part as:

> [A]ny explosive, incendiary, or poison gas--
>
> (i) bomb,
>
> (ii) grenade,
>
> (iii) rocket having a propellant charge of more than four ounces,
>
> (iv) missile having an explosive or incendiary charge of more than one-quarter ounce,
>
> (v) mine, or
>
> (vi) device similar to any of the devices described in the preceding clauses.

18 U.S.C.A. § 921(a)(4)(A) (West 1976). A Molotov cocktail -- a device comprising a bottle, gasoline, and a rag-- is a "destructive device" under this definition. See United States v. Simmons, 83 F.3d 686, 687-88 (4th Cir. 1996) (holding that Molotov cocktail was a "destructive device" under a virtually identical definition in another statute).

We have already concluded that viewed in the light most favorable to the Government, the evidence is sufficient to support the convictions of Tawalbeh, Obadya, and Rayed under § 924(c) for using a Molotov cocktail in the arson of the Corner Store under either an aider-and-abettor theory or a Pinkerton theory. See ante Part III.C. Having upheld their convictions, we conclude that the district court did not clearly err in finding them guilty under § 924(c) by a preponderance of the evidence. Accordingly, we hold that the district court did not clearly err in imposing consecutive thirty-year sentences on Tawalbeh, Obadya, and Rayed.

27

V.

For the reasons discussed, we find no error at the trial or sentencing phases of the criminal proceeding against Appellants. We therefore affirm Appellants' convictions and sentences.

<u>AFFIRMED</u>

28